310 Ga. 372
FINAL COPY

S20A0786.  HARRIS v. THE STATE.

WARREN, Justice.

A jury found Vincent Martinez Harris guilty of the malice murders of Tina Green-Hall and her six-year-old son, Jeremy Green-Hall.[1]  On appeal, Harris contends that the trial court abused its discretion by admitting certain evidence and committed plain error by failing to give the jury a limiting instruction regarding that evidence.  Harris also contends that his trial counsel rendered constitutionally ineffective assistance in various respects.  We affirm.

1.    Viewed in the light most favorable to the jury's verdicts,

---

[1] The crimes occurred on February 24, 2012.  A Muscogee County grand jury indicted Harris for two counts of malice murder.  Harris was tried from November 7 to 17, 2016, and a jury found him guilty on both counts.  On December 15, 2016, the trial court sentenced Harris to consecutive sentences of life in prison without parole.  On January 5, 2017, Harris filed a motion for a new trial through new counsel, which he later amended through current counsel.  After a hearing, the trial court denied the motion for a new trial, as amended, on October 1, 2019.  Harris timely filed a notice of appeal on October 17, 2019, and the case was docketed in this Court to the April 2020 term and orally argued on August 11, 2020.

the evidence presented at trial showed the following. In October 2011, Tina agreed that Harris could live with her and Jeremy in her house in Columbus because Harris had been ousted from the house he previously shared with his ex-girlfriend, Patricia Sherrod, who had taken out a temporary protective order ("TPO") against Harris. The original arrangement was for Harris to be out of Tina's house by December 2011, but Harris continued living there through January 2012 and into February. Only Tina and Harris had keys to Tina's house. Tina told her neighbors and her ex-husband, Jerry Hall, that she wanted Harris out and that she was going to ask Harris to leave. Hall testified that on Thursday, February 23, the day before the killings, he visited Tina and she told him she wanted to get a legal document forcing Harris to leave her house. Hall suggested that they do so together on the following Monday.[2] At

---

[2] On appeal, Harris points to evidence that Hall had previously thrown a brick through Tina's window and stolen items from her home, and Tina had taken out a TPO against Hall, which he was arrested for violating approximately six months before the killings. Investigators contacted Hall on the day of the killings and he consented to a gunshot residue test of his hands, which "reveal[ed] three particles associated with gunshot primer residue."

trial, Tina's neighbor, Emma Stokes, testified that Harris told her that "[']another woman will not put me out of – would never put me out, I will kill her first.[']  Those [we]re his exact words."  On Friday, February 24, Tina and Jeremy both died from gunshot wounds to the chest.

According to Harris, when he returned home from work at approximately 1:30 p.m. that day, he found Tina's and Jeremy's bodies next to each other in Jeremy's bed.  Harris called 911 and told the operator, "I need to report a double murder," before then saying, "two people just killed themselves in my house."  Harris informed the operator that "they [are] beyond hope."  When the operator asked if Harris knew whether Tina "happened to be in any kind of altercation with anybody," Harris responded "no," and noted that Tina and her ex-husband "have a good relationship."  Harris also volunteered that Tina "was going through a lot of problems, financial problems," that "she had told her mother I guess two months or so ago that she . . . was planning on doing it," and that her mom "didn't really care and told her to go ahead and do it,"

3

implying that Tina was suicidal.[3]

Responding officers found no signs of forced entry, and nothing was taken from the house. Tina and Jeremy were cold to the touch. Officers recovered a .38-caliber Rossi revolver from Jeremy's bedroom; it was lying on the floor near the foot of the bed, out of Tina's reach. In Harris's bedroom (which he did not share with Tina), officers found a set of keys that unlocked a safe also located in Harris's bedroom. Officers found an empty Rossi gun case and an ammunition box with bullets missing inside the safe.

Harris told responding officers that when he left for work at 5:30 that morning, Tina and Jeremy were asleep together in Jeremy's bed; that the door was locked when he returned home; that he had to unlock both locks on the door before entering; and that he found Tina and Jeremy dead when he got inside the home. Harris

---

[3] Tina's mother testified at trial that Tina had never talked to her about committing suicide, and that "Tina would never do nothing to hurt herself or that baby." Tina's friends, neighbors, and co-workers also testified at trial to similar sentiments like Tina being an "optimistic" person with a "zest for life" who "would never do this . . . would never take her own life, uh-uh, Jeremy, uh-uh, no."

4

also told responding officers that Tina "struggled with depression," and that "Tina was probably thinking that she was doing him a favor" by killing herself and her son.

The same day, February 24, Harris was transported to the Columbus police station, where he agreed to give a statement to police. That six-hour interview was video-recorded and played for the jury at trial. Harris was not given the *Miranda*[4] warnings before that interview; Sergeant Michael Dahnke testified that at that time, Harris was a witness, not a suspect. During that interview, Harris again claimed that Tina had discussed suicide with her mother, who told Tina to "go ahead and do it."

Harris consented to having buccal swabs and multiple gunshot residue tests taken. Testing of Harris's pants "revealed a small quantity of gunshot primer residue," and testing of his jacket "revealed particles that are associated with [gunshot residue]."[5]

---

[4] See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[5] Harris's hands did not reveal the presence of gunshot primer residue, and Tina's hands did reveal "the presence of gunshot primer particles."

5

Dr. Douglas Posey, the medical examiner who performed autopsies on Tina and Jeremy, determined that they each died from a single gunshot wound to the chest and initially classified the manner of Tina's death as suicide. In August 2012, a detective closed the case as a murder-suicide with a notation to re-open it if other pertinent evidence arose. On April 2, 2013, Columbus police asked Dr. Posey to "reassess" Tina's autopsy report. Dr. Posey amended Tina's manner of death from "suicide" to "undetermined" based on "additional investigative information." At trial, Dr. Posey testified that Tina — who was right-handed — was shot in the chest, "from the left to right, from the front to back and downward."

Columbus Police Sergeants Randy Long and David Jury testified that after further examination of the file and of crime-scene evidence, they believed that Tina had been shot before Jeremy. Dr. Kris Sperry, the Georgia Bureau of Investigation's chief medical examiner, testified that "after [Dr. Posey] had retired, then I was contacted by representatives from the Columbus Police Department in order to look at really the scene photographs and review the

6

report and kind of re-evaluate the case from my perspective as a forensic pathologist or medical examiner." Dr. Sperry concluded that, based on the movement of the bedding in conjunction with the placement of the bodies, "the order of the gunshot wounds [was] that [Tina] had been shot first and then the boy had been shot second, which would be of course the opposite of what would have occurred if this were a suicide." On December 15, 2014, Dr. Sperry amended Tina's manner of death from "undetermined" to "homicide." Harris was arrested, waived his *Miranda* rights, and gave a second statement to law enforcement denying that he killed Tina and Jeremy.

Harris does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, consistent with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial was sufficient to authorize a rational jury to find Harris guilty beyond a reasonable

7

doubt of the crimes for which he was convicted.[6]  See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

2.    Harris contends that the trial court abused its discretion by allowing certain evidence to be presented to the jury.  Specifically, Harris complains that evidence regarding an incident with his ex-girlfriend, Sherrod, that resulted in a TPO being entered against him, as well as evidence regarding his ex-wife, Charlene Doleman, and ongoing alimony disputes with her, should not have been admitted in his trial for the murders of Tina and Jeremy because, according to Harris, it was extrinsic evidence that did not satisfy the requirements of OCGA § 24-4-404 (b) ("Rule 404 (b)").[7]  But because

---

[6] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020.  See *Davenport v. State*, 309 Ga. 385, 392 (846 SE2d 83) (2020).  The Court began assigning cases to the December term on August 3, 2020.

[7] That statute provides, in relevant part:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

OCGA § 24-4-404 (b).

the trial court neither abused its discretion nor plainly erred in admitting the Sherrod/Doleman evidence, we disagree.

(a) *The Sherrod / Doleman evidence.*

The bulk of the evidence that Harris complains about on appeal was introduced through the video recording of his February 24 interview with police. The vast majority of that interview did not have anything to do with Sherrod or Doleman, and even the parts of the interview that did for the most part only generally touched on the nature of Harris's difficulties with Sherrod, which caused him to leave the house he shared with Sherrod and move in with Tina. For example, when asked about his current residence, Harris responded, "right now, I'm just staying with [Tina] because I got kicked out my house." However, some of Harris's statements to police revealed more details about the underlying facts of the Sherrod TPO and the Doleman alimony dispute.

Those more specific statements included that "a judge ordered me out of my house . . . [b]ecause [Sherrod] said she felt like her life was threatened." Harris told the investigator that Sherrod "was

9

trying to figure a way to steal my house and she did." Harris further explained that Sherrod was "highly upset" because Harris had "met another girl," and that one night when he came home from work, his bedroom door had been taken off its hinges and was missing. Harris explained that he suspected Sherrod, so he "busted out about four windows," "broke up some other stuff," and "wrote some things on the wall" because he was "angry as hell." According to Harris, Sherrod "said she feel like she threatened and I'm gonna kill her, and the Judge said 'I believe you; 6 months out your house.' So that's how I end up with Tina in October."[8] Harris also stated that "now the house" he previously lived in with Sherrod was "supposed to be sold on the courthouse steps."

Later in the interview, Harris told the investigator that Harris's ex-wife, Doleman, was "dragging [him] back and forth to

---

[8] Also related to Sherrod was Stokes's testimony that Harris, in expressing his anger over Sherrod to Stokes, stated that "another woman will not put me out of — would never put me out, I will kill her first." Harris argues that the availability of Stokes's testimony is one of the reasons why the similar Sherrod evidence was not necessary to the State's case.

court. And that's where Tina came in, because Tina felt like she was a burden to me because all these people were doing stupid stuff."[9] Harris said that he "just went to court with [Doleman] that week," and that their "divorce just got finalized a couple months ago." This discussion prompted the investigator to ask, "so, you got three different relationships going on in some capacity then?" to which Harris responded, "yeah." And shortly after that, while explaining his actions on the day of the murders, Harris said that he thought about paying Doleman $470 that he owed her on the way home from work, but "decided to wait until Monday because I wanted [Doleman] to suffer before I do it."[10]

Unrelated to his statements to police, Harris also gave an interview to a local television station which was later played for the

---

[9] Although Harris contends on appeal that the trial court abused its discretion by admitting certain evidence pertaining to Doleman, the record shows that Harris's trial counsel did not object to that Doleman evidence at trial and thus waived ordinary appellate review of that issue on appeal. See Division 2 (c), below.

[10] This last statement was referenced during the prosecutor's cross-examination of Harris at trial.

jury.  In that interview, Harris said that he "got in trouble,"  "made

a bad mistake," and

> I called Tina, and just telling her what the Judge said that
> he put me out the house because he felt like I'm a violent
> person, which I am not . . . . But I understand the judge.
> When you talk about domestic violence, it's on the rise, so
> he felt that for the safety of my roommate that I needed
> to go somewhere and cool off.  30 minutes after I called
> Tina, she said "here's the key."[11]

Before trial, Harris made an oral motion in limine requesting

"that the State not go into . . .  evidence pertaining to Ms. Sherrod,"

and that as to Sherrod, the "testimony be limited not to include any

prior bad acts."  The trial court denied Harris's motion.  Although

the trial court did not specify at that time or when the issue was

later revisited whether the evidence was admissible as intrinsic or

---

[11] Harris also complains that "if the prior bad acts were not at the center
of the case by the close of the State's evidence, the cross-examination of Harris
brought the acts to the foreground" when "Harris was impeached extensively"
and "crushed" with this evidence.  But Harris's trial testimony was less
detailed about either the Sherrod TPO incident or the Doleman alimony
dispute than the evidence described above, and we do not agree with Harris's
characterization of the cross-examination concerning any of the Sherrod or
Doleman evidence as "crush[ing]."  As a result, Harris's trial testimony
concerning the Sherrod/Doleman evidence adds little, if anything, to our
analysis.

extrinsic evidence, in the trial court's order denying Harris's motion for new trial, the trial court specified that the challenged evidence was admissible intrinsic evidence[12] and that it satisfied the requirements of OCGA § 24-4-403 ("Rule 403").[13]

(b) *The trial court did not abuse its discretion by admitting the Sherrod-specific evidence.*

Because Harris specifically objected in his pre-trial motion in limine to the admission of the Sherrod evidence, his argument about that evidence is preserved for ordinary appellate review. We conclude that the trial court did not abuse its discretion in admitting the Sherrod evidence as intrinsic evidence.

---

[12] Harris complains about the trial court making this finding in its order on his motion for new trial because, according to Harris, "the 'intrinsic evidence' position is inconsistent with the arguments at trial." But it is well established "that the superior court has the power to interpret and clarify its own orders. Such power includes shedding light on the scope of an earlier ruling." *Barlow v. State*, 279 Ga. 870, 872 (621 SE2d 438) (2005) (citations omitted).

[13] That statute provides: "Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." OCGA § 24-4-403.

Harris argues that the Sherrod evidence was inadmissible as either extrinsic Rule 404 (b) evidence or as intrinsic evidence. Evidence is admissible as intrinsic evidence, rather than extrinsic evidence subject to Rule 404 (b), "when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense." *Williams v. State*, 302 Ga. 474, 485 (807 SE2d 350) (2017) (citation and punctuation omitted); see also *Brown v. State*, 307 Ga. 24, 29 (834 SE2d 40) (2019). Even when evidence is intrinsic, however, it "must also satisfy Rule 403." *Williams*, 302 Ga. at 485. "[I]t is within the trial court's sound discretion to determine whether to admit such evidence," *Fleming v. State*, 306 Ga. 240, 245 (830 SE2d 129) (2019), so we review a trial court's ruling admitting evidence as intrinsic for an abuse of that discretion. *Brown*, 307 Ga. at 29.

"[E]vidence 'pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted" as

14

intrinsic evidence "'if (it is) linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.'" *Williams*, 302 Ga. at 485-486 (quoting *United States v. Edouard*, 485 F3d 1324, 1344 (11th Cir. 2007)).[14] Moreover, "intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue." Id. (citation and punctuation omitted).

The general fact that Harris was forced to leave the house that he previously shared with Sherrod — a fact that explained why Harris moved in with Tina in the first place — was admissible as part of the State's case. The question here is whether the trial court abused its discretion in also admitting, as intrinsic evidence, specific evidence about why he had to leave that house, like that Harris

---

[14] "[W]hen we consider the meaning of a rule in Georgia's current Evidence Code that is materially identical to a Federal Rule of Evidence, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit, for guidance." *State v. Hamilton*, 308 Ga. 116, 121 (839 SE2d 560) (2020) (citations and punctuation omitted).

broke windows and "other stuff" and that Sherrod felt like Harris was a threat to her life, resulting in a judge entering a TPO against Harris.

Although we view this evidentiary issue as close, we conclude that under the circumstances of this case, the trial court's admission of the Sherrod evidence was not an abuse of its discretion. That is because the Sherrod evidence — even including details such as Harris breaking items and causing Sherrod to feel like her life was threatened — provided context to other witnesses' accounts of the circumstances surrounding Tina and Jeremy's murders — such as Stokes's testimony that Harris told Stokes "another woman will not put me out of — would never put me out, I will kill her first," and the testimony of multiple witnesses that Tina intended to kick Harris out of her house very soon — and helped explain Harris's possible motivations in facing those circumstances. Therefore, when considered in light of the other evidence presented in this particular case, the Sherrod evidence was reasonably "necessary to complete the story for the jury." *Williams*, 302 Ga. at 486.

16

Harris, however, argues that the Sherrod evidence was not intrinsic because it was not "necessary" to complete the story of Tina and Jeremy's murders. In addressing this argument, we note that the Eleventh Circuit has spoken of admissible intrinsic evidence as that which is "*reasonably necessary* to complete the story of the crime." *United States v. Fortenberry*, 971 F2d 717, 721 (11th Cir. 1992) (emphasis supplied); see also *United States v. Sanders*, 663 Fed. Appx. 781, 783 (11th Cir. 2016) (per curiam) (evidence that defendant had threatened to shoot someone before he was arrested and charged with illegal possession of a firearm was admissible as intrinsic evidence even though it "may not have been *strictly necessary* to the government's case," because although "[e]vidence of the uncharged criminal conduct may not be necessary to prove the charged offense, . . . there is no requirement that the government proffer only enough evidence to allow the jury to convict, and no more," and this evidence "helped the jury understand the sequence of events that led to the discovery of the firearm, and to Sanders's arrest") (emphasis supplied) (citing *United States v. Wright*, 392 F3d

17

1269, 1276-1277 (11th Cir. 2004) and *Fortenberry*, 971 F2d at 721).

Similarly, our Court has upheld a trial court's admission of intrinsic evidence as "necessary to complete the story of the crime for the jury" where the evidence "advanced" the State's "theory of the case" that the charged offenses "were the culmination of a series of" incidents, and "the State had *some need* for this evidence" to "g[i]ve further context as to why this series of incidents occurred." *Smith v. State*, 307 Ga. 263, 272-273 (834 SE2d 1) (2019) (citation and punctuation omitted; emphasis supplied); see also *Brewner v. State*, 302 Ga. 6, 14 (804 SE2d 94) (2017) (citing favorably language from *Old Chief v. United States*, 519 U.S. 172, 183 (117 SCt 644, 136 LEd2d 574) (1997), recognizing "'the offering party's need for evidentiary richness and narrative integrity in presenting a case'"). As such, when we consider what evidence is necessary for the State to complete the story of the crime, "necessary" is not used in a strictly literal sense, but rather, refers to what evidence is reasonably necessary for the State to complete the story of the crime.

Here, Stokes's testimony that Harris told Stokes "another

woman will not put me out of — would never put me out, I will kill her first," added significant weight to the State's theory that Harris killed Tina and Jeremy because Tina was trying to kick Harris out of her home.[15] And Stokes's testimony that Harris issued this threat is given more context and makes more sense in light of the evidence that Harris reacted violently to what he perceived as Sherrod's attempts to "steal" the house he and Sherrod shared. See *Thompson v. State*, 302 Ga. 533, 534, 542-543 (807 SE2d 899) (2017) (evidence that defendant was a drug dealer was intrinsic to the murders of a couple found shot to death inside their home, and therefore admissible, in part because the evidence was used to prove motive and "also provide[d] context to" a witness's testimony about the

---

[15] As noted above, part of Harris's argument is that the Sherrod evidence was not necessary "because Harris' out-of-court statement to Emma Stokes was available, independent evidence to support the State's theory of motive." But the State is not limited to proffering the minimum amount of evidence that would be sufficient for a jury to find a defendant guilty beyond a reasonable doubt. See, e.g., *Poole v. State*, 291 Ga. 848, 857 (734 SE2d 1) (2012) (recognizing the "State's entitlement to choose the evidence needed to prove its case"); *State v. Dixon*, 286 Ga. 706, 708 (691 SE2d 207) (2010) ("'[T]he familiar, standard rule [is] that the prosecution is entitled to prove its case by evidence of its own choice. . . .'") (quoting *Old Chief*, 519 U.S. at 186); *Sanders*, 663 Fed. Appx. at 783 ("[T]here is no requirement that the government proffer only enough evidence to allow the jury to convict, and no more.").

circumstances surrounding the crimes); *Williams*, 302 Ga. at 486 (evidence is "'inextricably intertwined' with the evidence regarding the charged offense if it forms an 'integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted'") (quoting *Edouard*, 485 F3d at 1344). In other words, Harris's actions and Sherrod's reaction concerning the TPO incident provided context and lent support to a key piece of evidence at the center of the State's theory of the case.

Moreover, the additional details about the Sherrod evidence presented to the jury did not just explain why Harris moved in with Tina; it also explained why Harris would not expect Sherrod to let him return to the house he previously shared with her if Tina ever "put [him] out." See *Clark v. State*, 306 Ga. 367, 374 (829 SE2d 306) (2019) (concluding that evidence that the defendant pushed and hit the victim's wife years before the murder of the victim was intrinsic and admissible because it "was necessary to complete the story of the crime for the jury" and "provided context for the charged offenses to explain why" the parties acted and felt the way they did). The

Sherrod evidence and other evidence developed at trial, which included the testimony of multiple witnesses that Tina wanted to evict Harris from her house and planned on doing so within the week, showed that this was exactly the predicament Harris faced: being kicked out of his residence by Tina and unable to return to his residence with Sherrod. As such, the Sherrod evidence was "intertwined with" the other evidence and witness accounts regarding the murders of Tina and Jeremy, and was part of the narrative of the case. Under the particular circumstances of this case, the limited additional facts about the Sherrod TPO that were presented to the jury "pertain[ed] to the chain of events explaining the context, motive, and set-up" of the murders, "form[ed] an integral and natural part of the witness's accounts of the circumstances surrounding the offenses," and were reasonably "necessary to complete the story of the crime for the jury." *Williams*, 302 Ga. at 485-486 (citations and punctuation omitted). The trial court, therefore acted within its discretion when it found that the Sherrod evidence was intrinsic to the charged offenses. See, e.g.,

*Keller v. State*, 308 Ga. 492, 505 (842 SE2d 22) (2020) (trial court did not abuse its discretion in admitting evidence that defendant argued with his ex-wife about his treatment of her son, kicking and damaging a door during the argument, because such evidence was intrinsic to the charged murder of the child); *McCammon v. State*, 306 Ga. 516, 522 (832 SE2d 396) (2019) (witness's testimony "that he and Appellant smoked marijuana during their six months of friendship before the murder . . . [although] further afield from the charged crimes, . . . was a natural part of [the witness's] account of his relationship with Appellant" and was admissible as intrinsic evidence).

Harris also argues that the Sherrod evidence was not intrinsic to the charged offenses because it "involved different parties, different locations, and different conduct, at different times." He specifically argues that the evidence was "mostly removed in time by over six months" from the charged offenses and "did not involve Tina or Jeremy," showing that it was "not part of" and did not "arise from" the charged offenses.

It is true that whether evidence is "linked in time and circumstances with the charged crime" is pertinent to the intrinsic-evidence analysis, see *Williams*, 302 Ga. at 485-486 (citation and punctuation omitted), but there is no bright-line rule regarding how close in time evidence must be to the charged offenses, or requiring evidence to pertain directly to the victims of the charged offenses, for that evidence to be admitted properly as intrinsic evidence. See, e.g., *Priester v. State*, 309 Ga. 330, 332-333 (845 SE2d 683) (2020) (evidence that witnesses, who were not victims or otherwise involved in the charged offenses — one of whom had known defendant "for nearly a year" — had purchased drugs from the defendant prior to the charged offense "was intrinsic to the crimes with which [the defendant] was charged" because it "was an integral and natural part of [the witness's] account[ ] of the circumstances surrounding the shooting"); *Clark*, 306 Ga. at 373-374 (rejecting defendant's argument that because evidence of a prior act of violence by the defendant "did not occur between [the defendant] and the victim," it was inadmissible, and concluding that a witness's testimony about

a three-year-old incident in which the defendant "pushed her against a door and hit her" was intrinsic to the defendant's murder of the witness's husband because it "was necessary to complete the story of the crime for the jury" and "provided context for the charged offenses"). Cf. *Virger v. State*, 305 Ga. 281, 293-294 (824 SE2d 346) (2019) ("The State's assertion [that certain evidence was intrinsic] is dubious, because none of the charged crimes were against [the victim of the prior incident] and the headlock incident occurred many months before the [charged crimes]. But we need not decide whether the evidence was properly admitted, because its admission was harmless.").[16] And because we have concluded that the trial court did not abuse its discretion in finding that the Sherrod evidence was intrinsic to the charged offenses, we need not determine the admissibility of that evidence under Rule 404 (b).

Finally, although the evidence that Harris broke items at the

---

[16] Harris also argues that the Sherrod evidence was not intrinsic because it was "not used by Harris in out-of-court statements to establish a trial defense." Although Harris's attempt to use evidence in his own defense may be relevant to whether he "opened the door" to certain evidence, that circumstance is not particularly relevant to our analysis here.

house he shared with Sherrod and that Sherrod felt like Harris had threatened her life was prejudicial, we see no abuse of discretion in the trial court's finding that "the challenged evidence satisfied the requirements of OCGA § 24-4-403," which permits the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice."  See *Smith*, 307 Ga. at 273 (concluding evidence was admissible as intrinsic to the charged offenses and satisfied Rule 403 where "the State had some need for this evidence," which "was not substantially outweighed by the danger of unfair prejudice"); *United States v. Estrada*, 969 F3d 1245, 1275 (11th Cir. 2020) (in criminal trial, evidence of numerous acts of violence and extortion by the defendants' organization was admissible as intrinsic evidence that satisfied Rule 403, "although some of the evidence . . . had the potential to elicit an emotional response from the jury").  The trial court therefore did not abuse its discretion in admitting the Sherrod evidence Harris complains about on appeal.

(c) *Harris waived ordinary appellate review for his claims*

*pertaining to the Doleman-specific evidence.*

Contrary to Harris's argument on appeal, his trial counsel did not object at the trial court level to any evidence concerning Doleman. Harris nonetheless contends that his complaints about the Doleman evidence were preserved for appeal. According to Harris, who points to *Clark*, 306 Ga. 367, that is because the State cited the Doleman evidence as part of its response to Harris's motion in limine to exclude the Sherrod evidence, meaning that the trial court's ruling denying Harris's motion in limine was a definitive ruling on the admissibility of the Doleman evidence as well, thus preserving the Doleman issue for ordinary appellate review. But neither *Clark* nor *Anthony v. State*, 298 Ga. 827, 831-832 (785 SE2d 277) (2016), another case on which *Clark* relies, stands for the proposition that an evidentiary issue may be preserved for ordinary appellate review when the objecting party makes no objection to the evidence whatsoever. Rather, *Clark* summarily held that because "the trial court ruled definitively at a pretrial hearing that evidence of the [prior bad] act would be admissible, [the defendant] was not

26

required to object to the evidence at trial to preserve his claim of error for appeal." 306 Ga. at 373-374. *Clark* based that holding solely on *Anthony*, which held that "'[o]nce the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not *renew an objection* or offer of proof to preserve such claim of error for appeal.'" Id. at 831-832 (emphasis supplied) (quoting OCGA § 24-1-103 (a)); see also OCGA § 24-1-103 (a) (1) ("Error shall not be predicated upon a ruling which admits or excludes evidence *unless* a substantial right of the party is affected *and* . . . [i]n case the ruling is one admitting evidence, *a timely objection* or motion to strike appears of record, stating the specific grounds of objection, if the specific ground was not apparent from the context[.]") (emphasis supplied). Neither *Clark* nor *Anthony* stands for the proposition that a party is not required to object to evidence to preserve an error on appeal, so long as the judge rules that evidence is admissible. Therefore, because Harris never objected to the Doleman evidence below, he has not preserved ordinary appellate review concerning the admission of that

27

evidence. But, because "[n]othing in [OCGA § 24-1-103] shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court[,]" OCGA § 24-1-103 (d), we may still review the trial court's admission of the Doleman evidence for plain error.

(d)   *The trial court did not commit plain error by admitting the Doleman evidence.*

"To establish plain error, Appellant must identify an error that was not affirmatively waived, was clear and not open to reasonable dispute, likely affected the outcome of the proceeding, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Thompson v. State*, 304 Ga. 146, 151 (816 SE2d 646) (2018). Here, even assuming without deciding that it was clear error to admit the Doleman evidence — that Harris was in an ongoing alimony dispute with his ex-wife and chose to temporarily delay paying her because he "wanted her to suffer" — the admission of Harris's passing, and relatively unsurprising, statement of bitterness toward his ex-wife did not likely affect the outcome of his

28

trial. See *Williams v. State*, 304 Ga. 455, 460 (818 SE2d 653) (2018) (no plain error because "mention of criminal damage to property did not likely affect the outcome of the proceedings"). Therefore Harris has not established plain error regarding the trial court's admission of the Doleman evidence. See *Taylor v. State*, 303 Ga. 225, 227-229 (811 SE2d 286) (2018) (trial court did not plainly err in admitting video of police interrogation of defendant that defendant claimed improperly referenced her character and prejudiced her).

3. In the alternative, Harris contends that the trial court committed plain error by failing to instruct the jury that the "extrinsic" Sherrod/Doleman evidence was admitted for the limited purpose of proving motive. But this alternative argument is based on the premise that the Sherrod/Doleman evidence was extrinsic Rule 404 (b) evidence, and holds little weight considering our analysis above.

Specifically, we have concluded that the trial court did not abuse its discretion in admitting the Sherrod evidence as intrinsic to the charged offenses. And although the Doleman evidence, which

29

consists of Harris's statement that he wanted to temporarily withhold alimony he owed Doleman to make her suffer, could be viewed as somewhat prejudicial, we have already determined that the admission of the Doleman evidence did not likely affect the outcome of Harris's trial. Therefore, Harris has not shown that the trial court, by not providing a Rule 404 (b) limiting instruction, committed an error that is "clear and not open to reasonable dispute" — as it concerns the Sherrod evidence — or that the alleged error "likely affected the outcome of the proceeding" — as it concerns the Doleman evidence. *Thompson*, 304 Ga. at 151. See *Williams*, 302 Ga. at 485 ("The limitations and prohibition on 'other acts' evidence set out in OCGA § 24-4-404 (b) do not apply to 'intrinsic evidence.'"); *United States v. Lehder-Rivas*, 955 F2d 1510, 1515 n.1 (11th Cir. 1992) (because "the vast majority of the disputed evidence was intrinsic to the crimes charged," a limiting instruction was "not required," and because, there, "the lower court's few erroneous admissions of extrinsic evidence were harmless," so was lower court's failure to provide a limiting instruction). This enumeration

30

of error also fails.

4. Harris contends that his trial counsel rendered constitutionally ineffective assistance by: (a) failing to request a Rule 404 (b) limiting instruction; (b) failing to object to inadmissible hearsay and bolstering testimony; and (c) failing to seek suppression of Harris's February 24 interview with law enforcement.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's

deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

(a)     *Failure to request a Rule 404 (b) limiting instruction.*

Harris's contention that his trial counsel was constitutionally ineffective for failing to request a Rule 404 (b) limiting instruction regarding the Sherrod/Doleman evidence is largely defeated by the analysis we have already provided regarding that evidence. As we have explained above, the trial court did not abuse its discretion in admitting the Sherrod evidence as intrinsic to the charged offenses, meaning that a Rule 404 (b) limiting instruction was not warranted for that evidence. And neither the admission of the Doleman evidence, nor any failure of the trial court to provide a limiting instruction concerning that evidence, likely affected the outcome of

Harris's trial. Therefore, Harris has not established that his trial counsel was deficient by failing to request a Rule 404 (b) limiting instruction concerning the Sherrod evidence, see *Jones v. State*, 287 Ga. 770, 771 (700 SE2d 350) (2010) ("[T]rial counsel cannot be faulted for failing to request a jury charge that was not authorized by the evidence."), or that, absent counsel's alleged deficiency in failing to request a Rule 404 (b) limiting instruction pertaining to the Doleman evidence, there exists a reasonable probability that the result of his trial would have been different, see *Davis v. State*, 302 Ga. 576, 586 (805 SE2d 859) (2017) (defendant failed to show that counsel's failure to request a Rule 404 (b) limiting instruction concerning evidence of defendant's "prior familial disputes" affected the outcome of his trial); *Higginbotham v. State*, 287 Ga. 187, 191 (695 SE2d 210) (2010) ("Assuming deficient performance in the failure to request a limiting instruction, appellant did not establish prejudice therefrom — that the outcome of his trial would have been different had the jury been told they were to consider the prior [felony] convictions only for" the limited purpose for which they were

admitted); see also *Roberts v. State*, 305 Ga. 257, 265 (824 SE2d 326) (2019) ("[T]he test for prejudice in the ineffective assistance analysis is equivalent to the test for harm in plain error review.") (citation and punctuation omitted).[17]  Because Harris has failed to show that he was prejudiced by trial counsel's alleged deficiency, his claim fails.

> (b)   *Failure to object, on hearsay and bolstering grounds, to testimony from four of the State's law enforcement witnesses.*

Harris briefly argues that his trial counsel was constitutionally ineffective for failing to object, on hearsay and bolstering grounds, to testimony from four of the State's law enforcement witnesses: Sergeant Frank Massa, Sergeant John Bailey, Detective Amanda

---

[17] In this case, the prejudicial effect of any assumed trial court errors and deficient performance by counsel, considered cumulatively, see *State v. Lane*, 308 Ga. 10, 14 (838 SE2d 808) (2020), is no more prejudicial than when considered in isolation because our separate holdings — that the result of Harris's trial was not likely affected by either the trial court's admission of or failure to provide a limiting instruction regarding the Doleman evidence, or by his trial counsel's failure to request a limiting instruction concerning that evidence — are based only on the admission and consideration of the same evidence.

Hogan, and Detective Matt Blackstock.[18]

But "counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Daughtie v. State*, 297 Ga. 261, 266 (773 SE2d 263) (2015) (quoting *Strickland*, 466 U.S. at 690). At the hearing on his motion for new trial, Harris did not ask trial counsel why she did not raise hearsay and bolstering objections to the relevant testimony of Detectives Hogan or Blackstock. In his scant briefing of the issue, Harris does not demonstrate how trial counsel's presumed strategic decisions were unreasonable, and the record reveals no apparent indications that trial counsel's decisions not to object were unreasonable. Therefore, Harris has not shown that his trial counsel was deficient in this regard. See *Williams*, 302 Ga. at 486 ("'[R]easonable decisions as to whether to raise a specific objection are ordinarily matters of trial strategy and provide no

---

[18] We note that Harris did not raise the argument concerning Sergeants Massa or Bailey in his motion for new trial and has therefore waived his contentions concerning those two witnesses on appeal. See *Williamson v. State*, 305 Ga. 889, 897 (827 SE2d 857) (2019).

ground for reversal.'") (quoting *Ballard v. State*, 297 Ga. 248, 254 (773 SE2d 254) (2015)); *Mitchell v. State*, 290 Ga. 490, 492 (722 SE2d 705) (2012) ("The decision not to object to certain hearsay or to leading questions is often the result of reasonable trial strategy. Because Appellant has not made a contrary showing, he has failed to show deficient performance.") (citation and punctuation omitted).

(c)     *Failure to seek suppression of Harris's February 24 interview with police.*

Harris contends that his trial counsel rendered constitutionally ineffective assistance by failing to seek suppression of Harris's February 24, 2012 interview with police. But because the record shows that trial counsel exercised reasonable professional judgment in making this decision, Harris again fails to show deficient performance.

The record shows that trial counsel made a strategic decision to not seek suppression of Harris's interview. What is more, Harris has not made a strong showing that a motion to suppress that interview would have been granted. See *Wingster v. State*, 295 Ga.

725, 727 (763 SE2d 680) (2014) ("[W]hen trial counsel's failure to file a motion to suppress is the basis for a claim of ineffective assistance, the defendant must make a strong showing that the damaging evidence would have been suppressed had counsel made the motion.") (citation and punctuation omitted). And regardless, there were significant potential benefits to Harris in not seeking suppression of his February 24 interview with police — some of which were mentioned by his trial counsel in her testimony at Harris's motion for new trial hearing. At that hearing, Harris's trial counsel testified that Harris's television interview "obviously contained some of the same information that he would have gave in the [February 24 police] interview," and that she had "to balance that with the statement he had already made to the local news station as well, which [she] already knew was coming in evidence anyway." And trial counsel testified that "the whole theory of the case that Mr. Harris was cooperative from the very beginning, never tried to hide anything, basically was an open book as far as with the investigation. So I don't recall the voluntariness being an issue that

37

I recall."

If Harris chose not to testify at trial, the February 24 interview would allow the jury to hear his version of the story without being subject to cross-examination, whereas if he chose to testify — which is what ultimately occurred — the key parts of the February 24 interview would likely be admissible for impeachment purposes. In either event, allowing the State to play the February 24 interview for the jury without objection tended to support Harris's overall theory of the case that he was cooperative and forthcoming throughout the investigation. Aside from the various instances of potential upside for Harris, the downside of forgoing an attempt to suppress the February 24 interview was limited, considering that much of this evidence was cumulative of other evidence admitted at trial, including the television interview Harris gave for a local news station. See, e.g., *Dent v. State*, 303 Ga. 110, 118 (810 SE2d 527) (2018) ("[A]t the motion-for-new-trial hearing, trial counsel testified that he wanted the video of the custodial interrogation admitted because, in his opinion, it assisted his client's defense. Thus, this

was a strategic decision which has not been shown to be professionally unreasonable."); *Jones v. State*, 300 Ga. 543, 547 (796 SE2d 659) (2017) (where trial counsel testified that he decided not to seek suppression of defendant's statements, in part, because much of what defendant said in those statements was cumulative of other evidence presented at trial, and because playing defendant's recorded statements "would allow her to present her defense to the jury without requiring her to testify," that was a "strategic decision [that] does not amount to ineffective assistance"); *Smith v. State*, 300 Ga. 532, 536 (796 SE2d 671) (2017) (no deficient performance because "[a]t the motion for new trial hearing, counsel testified that during the trial, before Smith's custodial statements were introduced, she learned that Smith wanted to testify," and therefore decided to withdraw her motion to suppress "based upon her knowledge that once Smith testified, his custodial statement would be admitted for purposes of impeachment").

Therefore, trial counsel's strategic decision to not seek suppression of Harris's February 24 interview was within the

39

bounds of reasonable professional judgment, and Harris fails to show that trial counsel's decision was unreasonable. Because Harris has failed to show that his trial counsel was deficient, Harris's claims of constitutionally ineffective assistance of counsel fail.

*Judgment affirmed. All the Justices concur.*

Decided October 19, 2020 —Reconsideration denied November 16, 2020.

Murder. Muscogee Superior Court. Before Judge Mullins.

*Matthew K. Winchester*, for appellant.

*Julia F. Slater, District Attorney, George E. Lipscomb II, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.