**SECOND DIVISION**
**RICKMAN, C. J.,**
**MILLER, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 24, 2022**

# In the Court of Appeals of Georgia

A22A0473. JONES v. THE STATE.

PIPKIN, Judge.

Appellant Brenton Jones was found guilty of aggravated battery and cruelty to children in the first degree and sentenced to ten years, with the first year to be served in confinement and the balance probated. He appeals following the denial of his motion for new trial, as amended, contending that the evidence was insufficient, that his trial counsel was ineffective, that the trial court erred by admitting irrelevant evidence, and that the cumulative effect of these errors denied him a fair trial. As more fully set forth below, we now affirm.

Construed to support the jury's verdict,[1] the evidence shows that in July 2016, the 21-month-old victim[2] was living in Clarke County, Georgia with his mother, Ariel Jackson; Appellant, who was Jackson's boyfriend; Appellant's and Jackson's newborn daughter; and, at times, Appellant's four-year-old son, A. J. Appellant was helping potty-train the victim, and had been alone with him while Jackson was feeding their daughter in another room. Jackson's sister, Shamona Brown, and another woman stopped by, and, according to Brown,[3] the victim was sitting on a potty-chair without a shirt when they arrived. She said Appellant came into the room and rushed to put a shirt on the victim, but they noticed marks on the victim's back, which Brown described as big and purple; Brown also testified it looked like the marks "just happened." Jackson and her sister argued about how the victim got the marks, and according to Jackson, Appellant was defensive and denied responsibility. Jackson convinced herself at that time that the victim had fallen off the bed.

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[2] The victim was born on November 2, 2014.

[3] Brown also testified that the victim was a happy child, but that when Appellant was around him, the victim would put his head down and run to one of the other adults.

2

Jackson testified that she had a doctor's appointment on the morning of August 22, 2016, and that she took both her newborn daughter and the victim with her. The victim became cranky and was crying inconsolably. Jackson was frustrated and called her mother to talk to the victim in an attempt to help him stop crying. She also sent Appellant a text message stating, "I can't wait to leave this office. [The victim] getting his ass [tore] up." Jones responded "Lol, I'm about to take a nap. Okay, Babe, get his ass." Jackson explained at trial that she was frustrated and said she never intended to, and did not in fact, physically discipline the victim that day.

Jackson testified that the victim fell asleep when they arrived back home but that she woke him 30 to 45 minutes later because she had to pick up A. J. from school. Jackson said A. J. was delayed coming out of school, and the victim started crying again when they were waiting in the car; Jackson said she assumed he was hungry since the victim had not eaten the snack she had prepared for him, so when they arrived back home, she gave him something to eat.

Appellant was at home between his two jobs, and Jackson left the three children – the victim, A. J., and their newborn daughter – at home with Appellant while she ran an errand. She said that the victim was happy when she left, noting that he was eating chicken nuggets, dancing, and playing on the bed with A. J.

3

Jackson testified that, when she returned home about an hour later, Appellant and A. J. were playing a video game in the living room, and Appellant told her the victim was in the bedroom sleeping. Appellant left to go to his second job a short time later. A. J. went into the bedroom where the victim was supposedly sleeping and told Jackson that something was wrong. Jackson said she ran into the room and heard the victim making a noise she had never heard before, which she mimicked at trial. She said that she tried to get the victim to talk to her, but he was limp and unresponsive to both her voice and touch.

Jackson called Appellant, who had only been gone two or three minutes and was still en route to his second job, and he came home to take the victim to the hospital. They called 911 while they were en route and were met by an ambulance at a McDonald's. The victim was taken to Athens Regional Hospital, where he was examined by an emergency room doctor and a neurosurgeon, both of whom testified at trial.

When he arrived at the hospital, the victim was unresponsive, intermittently crying and moaning, and flailing around; as he was being prepared for a CAT scan, he had a seizure. The CAT scan of the victim's brain revealed bleeding in the subdural area of the brain, which had caused a significant "mid-line shift," or

4

movement of the brain to one side. The neurosurgeon, Dr. Bryan Barnes, testified that the bleeding was significant and that there was also a significant amount of pressure on the brain stem, which controls breathing and respiration. Dr. Barnes testified that he performed an emergency hemicraniectomy – which involved cutting out part of the skull to relieve the pressure and stop the bleeding – in order to save the victim's life.

The victim was then transported by helicopter to Children's Healthcare of Atlanta ("CHOA"). Jackson and Appellant went home to pack before they left for the hospital, and Jackson's mother and brother were already at CHOA by the time they arrived. Jackson said that her mother was angry because "she had found out through the doctor that somebody intentionally did that to [the victim]. It wasn't an accident." Jackson said she questioned the doctor, and he told her that "it was more like an adult who had struck him in the head intentionally." She testified her initial reaction was she thought the doctors were wrong.

Dr. Stephen Messner, a child abuse pediatrician and medical director of the child protection team at CHOA, testified that he observed a bruise behind the victim's ear, as well as markings on the victim's back, including buckle marks, consistent with

the victim having been struck with a looped-over belt.[4] Dr. Messner also observed multiple retinal hemorrhages, and an MRI revealed that the victim's brain had continued to swell so that it had expanded outside the skull, that blood remained around parts of the victim's brain, and that areas of brain tissue had started to die; additionally, swelling between the vertebrae of the neck indicated a whiplash-type injury. Dr. Messner testified that the marks on the victim's back and the injury to his brain, which indicated that significant force had been applied to the victim's head and neck, could not have been "self-inflicted," meaning that the victim could not have sustained the injuries from jumping or falling off a bed. Further, Dr. Messner said that in the absence of any history of a motor vehicle crash or other high velocity accident such as falling from a height of several stories, his expert opinion was that the victim's head injuries were the result of non-accidental "inflicted" trauma.[5] Dr. Messner also testified that the effects of the injuries would have been immediately observable, noting that the victim would have become unresponsive and limp and that his breathing would have been altered or even ceased. Dr. Messner also told the jury

---

[4] Photographs of the victim's external injuries were introduced into evidence at trial.

[5] Dr. Barnes gave a similar opinion as to the cause of the injuries. Dr. Messner also testified that a four-year-old playmate could not have caused these injuries.

6

that, in his experience, triggers for child abuse include incessant crying and frustration from unrealistic expectations such as expecting a 21-month-old child, particularly a boy, to become potty trained.

The victim was released from the hospital on October 5, 2016. Multiple witnesses, including the victim's regular pediatrician, testified that the victim was a happy child before he was injured, that he was walking and beginning to talk, and that he had no mental or physical developmental issues. However, after the brain injury, he could not walk or talk, he was partially paralyzed on his right side, and he required seizure medication. By the time of trial, and after years of intensive speech, physical, and occupational therapy, the victim had improved, but a recent CAT scan showed that areas of the victim's brain were permanently damaged.

After police learned that A. J. was present in the home on the day of the incident, he was interviewed by an expert trained to interview children; this interview was recorded and played for the jury at trial. When he was asked what happened to the victim, A. J. said that the victim could not open his eyes and was not responding. A. J. told the interviewer multiple times that Appellant "whupped" the victim with a belt because he was crying, that Appellant told the victim to stop crying, and that he also hit the victim multiple times in the head or face with a ball. When the interviewer

asked A. J. why Appellant "whupped" the victim, A. J. called the victim a crybaby, which is a term that other witnesses said the Appellant called the victim, and said that he cried all the time. At one point during the video, A. J. hit a doll in the head and said "stop that crying." A. J. also told the interviewer that the ambulance met them at the "chicken nugget place." The interviewer, who had conducted over 1300 forensic interviews, testified that her interview with A. J. was unique in the sense that "you can physically watch him try to process the information. You can see him doing direct recall of things that you know that, based on the words that he uses and the hand gestures that he uses and things, you can see him almost like rewatching that, trying to understand."

Appellant testified in his own defense at trial. He testified about his multiple jobs and said that Jackson was the primary caregiver for the children, although they would sometimes stay with his mother while Jackson worked part-time. Further, Appellant testified about the text message he received from Jackson when the victim would not stop crying while she was at the doctor. He also told the jury about Jackson's struggles caring for the children and indicated that she suffered from depression and had attempted suicide while pregnant with their daughter and threatened to kill the victim.

8

Appellant also testified about the timeline of events the day of the incident, in particular the timeframe when he was alone with the children. According to Appellant, he was in the living room with his daughter, watching television, while A. J. and the victim were playing in their bedroom; Appellant claimed that when he checked on them, the victim was laughing. He testified that he went back to the other room with his daughter and then heard a loud boom. Because, according to Appellant, the victim sometimes kicked or threw a ball at the wall, Appellant stayed where he was and did not check on the children. Appellant testified that A. J. then came into the room and said that the victim was asleep, so he went to check on him. Appellant testified that the victim appeared to be sleeping normally and he put a cover over the victim and then went to the other room. Appellant said that Jackson came home and that he left for his second job about ten minutes later; before he left, he did not see the victim again and did not see Jackson check on the victim. According to Appellant, Jackson called him about ten minutes later and he went back home to take the victim to the hospital. Appellant denied that the victim had been fussy or whining while he was alone with the victim that day, and he denied ever hitting the victim with a belt or physically disciplining him in any way.

9

1.Appellant first argues that the evidence was insufficient to convict him of cruelty to children in the first degree.[6] Under OCGA § 16-5-70, a person commits the crime of cruelty to children in the first degree when he "maliciously causes a child under the age of 18 cruel or excessive physical or mental pain." Appellant admits that the evidence showing that the victim suffered physical or mental pain is overwhelming, but argues that the evidence was insufficient to show that *he* caused the pain or acted maliciously. In support of this contention, Appellant argues that the circumstantial evidence presented at trial did not rule out the possibility that Jackson caused the victim's brain injury and that the evidence was conflicting and unclear.

As an initial matter, it is important to point out that the evidence here is not entirely circumstantial – A. J.'s forensic interview, during which he described what Appellant did to the victim on the day in question and which was played for the jury in its entirety, was direct evidence of Appellant's guilt. See *Curgil v. State*, 363 Ga. App. 355, 358 & n.3 (871 SE2d 322) (2022). Further, as our appellate courts have

---

[6] Jones was charged with two counts of cruelty to children in the first degree – Count 2 based on the victim's head injury and Count 3 based on the acts of hitting the victim with a belt. He was found not guilty of Count 3, so here we consider only Count 2. Moreover, although Appellant does not mention the aggravated battery conviction in his enumeration or arguments challenging sufficiency, we find the evidence sufficient on that count as well.

explained numerous times, it is for the trier of fact – here the jury – to resolve conflicts or inconsistencies in the evidence, to determine the credibility of witnesses, and to draw reasonable inferences from the evidence presented at trial. See, e.g., *Smith v. State*, 308 Ga. 81, 84 (1) (839 SE2d 630) (2020). Having examined the entirety of the record, including the evidence set out above as well as other evidence presented at trial, we find the evidence more than sufficient to authorize any rational trier of fact to find Appellant guilty beyond a reasonable doubt of the crimes of which he was convicted. Accordingly, this enumeration presents no basis for reversal.

2. Appellant also contends that his trial counsel was ineffective. To prevail on this claim, Appellant must show both that his counsel performed deficiently and that he was prejudiced as a result of the deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove deficient performance, Appellant must show that his counsel acted or failed to act in an objectively unreasonable way, considering all the circumstances and in light of prevailing professional norms. Id. at 687-690 (III) (A). "This is no easy showing, as the law recognizes a 'strong presumption' that counsel performed reasonably," and to overcome that presumption, Appellant "must show that no reasonable lawyer would have done what his lawyer did, nor would have failed to do what his lawyer

11

did not." (Citation omitted.) *Davis v. State*, 299 Ga. 180, 183 (2) (787 SE2d 221) (2016). To establish prejudice, Appellant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). "This burden is a heavy one[.]" *Jordan v. State*, 307 Ga. 450, 454 (3) (836 SE2d 86) (2019).

(a) Appellant first argues that his trial counsel was ineffective because he failed to object to what Appellant alleges is improper bolstering testimony. As to this issue, the evidence shows that during the State's cross-examination of Cheryl Barnett, Appellant's aunt who was called as a witness for the defense, the State played a portion of A. J.'s forensic interview where A. J. stated that Appellant "whup[ped]" the victim. The State immediately asked Barnett if she knew A. J., and when she responded yes, then asked "Do you believe him to be a liar?" Barnett responded, "No."

Pretermitting whether this testimony was subject to objection, see OCGA § 24-6-608 (a), the transcript from the hearing on Appellant's motion for new trial shows that while trial counsel was asked about other matters in relation to this witness, he was never asked about his failure to object to this testimony. "Absent testimony

12

explaining trial counsel's rationale on this point, an appellate court generally presumes that trial counsel's actions were strategic, and only when a strategic decision is so patently unreasonable that no competent attorney would have made it do we find ineffective assistance of counsel."*Moreland v. State*, 356 Ga. App. 452, 457 (2) (a) (iii) (847 SE2d 641) (2020). Given the fleeting nature of the testimony and the way the question was phrased, coupled with the fact that the jury viewed A. J.'s lengthy forensic interview and heard not just what A. J. said but also how he imparted the information during the interview, it was not objectively unreasonable for counsel to decide the better tactic was not to draw attention to the testimony even if was objectionable. Accordingly, Appellant has failed to show that his trial counsel performed deficiently by failing to object. See, e.g., *Priester v. State*, 350 Ga. App. 200, 205-206 (4) (828 SE2d 439) (2019) ("Georgia cases have recognized that the failure to object to bolstering can also be part of a reasonable trial strategy.").

(b) Appellant next argues that his trial counsel was ineffective for failing to object when Jackson, referring to her arrival at CHOA, testified about her mother being mad because the doctor told her mother that the victim's injuries had been intentionally inflicted. Appellant argues that his trial counsel should have objected to this testimony on hearsay and bolstering grounds.

13

As was evident at trial and as trial counsel testified at the hearing on Appellant's motion for new trial, the main defense strategy was to show that others had greater access to the victim and more opportunity to harm him, and, in particular, on the day of the incident, Jackson was with the victim most of the day while Appellant was alone with the victim only briefly – 40 minutes to an hour. It was not objectively unreasonable for trial counsel to forego an objection to this testimony since his strategy was not to focus on the intentionality of the act, about which the evidence was overwhelming, but to show that Appellant was not the person who injured the victim. Further, counsel knew that more extensive expert testimony would be presented later in the trial dispelling any notion that the injuries were the result of an accident, and an objection to Jackson's passing reference to this evidence would only serve to highlight it. Once again, trial counsel was not asked at the motion for new trial hearing why he did not object to the complained-of testimony, and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citation and punctuation omitted.) *Harris v. State*, 310 Ga. 372, 386 (4) (b) (850 SE2d 77) (2020). We thus agree with the trial court that trial counsel's decision to forego a hearsay or bolstering objection to this testimony did not constitute deficient performance.

14

(c) Appellant also argues that his trial counsel was ineffective because he failed to object to testimony about conversations that Jackson had with her attorney concerning charges that were brought against her relating to the incident. The record shows that during cross-examination, trial counsel elicited testimony from Jackson that she originally faced the same charges as Appellant but that the charges had been dropped. On redirect, the State questioned Jackson about her testimony that the charges against her were the same as the charges that had been brought against Appellant, and she acknowledged the charges were not the same – that she was charged with cruelty to children in the second degree, while Appellant had been charged with cruelty to children in the first degree and aggravated battery. Jackson indicated that she understood the differences between the charges, and she also acknowledged that an attorney explained to her that the crime she was charged with related to her allowing the victim to be injured, not perpetrating the injuries upon him. On re-cross, trial counsel elicited testimony emphasizing that "either way," all charges against Jackson had been dismissed and she was now testifying for the State.

Appellant now argues that his trial counsel should have objected to this hearsay testimony and that "hav[ing] these definitions [of the crimes] introduced through hearsay by an unqualified witness was prejudicial." Further, Appellant argues that

15

Jackson waived her attorney-client privilege by testifying about this conversation with her attorney, and that once she did so, trial counsel should have cross-examined her about all the conversations she had with her attorney.

First, as the trial court found, Jackson's testimony did not touch on matters of strategy or any other topic that would result in a waiver of the attorney-client privilege, and trial counsel did not render deficient performance by failing to attempt to elicit such testimony. Further, even assuming the testimony about what Jackson's attorney told her about the charges was inadmissible hearsay, such testimony was rendered harmless when the lead investigator in the case testified that the warrant she took out against Jackson was for cruelty to children in the second degree "*for failing to make a reasonable attempt to protect* the victim." (Emphasis supplied.) See *Anglin v. State*, 302 Ga. 333, 336 (2) (806 SE2d 573) (2017) ("[T]he erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced."). Lastly, the jury was properly instructed about the elements of the crimes Appellant was charged with having committed, and, even assuming deficient performance, Appellant has failed to show prejudice. Accordingly, this ineffective claim also fails.

(d) Appellant contends that trial counsel was ineffective for failing to impeach the victim's maternal grandmother. Specifically, Appellant argues that a Facebook post in which the grandmother allegedly made favorable comments about Appellant should have been introduced to impeach her trial testimony that the victim seemed scared of Appellant and that Appellant made derogatory remarks in reference to the victim – such as calling him a crybaby – and did not treat the victim in the same favorable manner that he treated his biological son.

The transcript shows that trial counsel did not attempt to cross-examine the grandmother with the post during her testimony, and that he did not provide it to the State until the evening before the last day of trial after the State had rested.[7] Trial counsel indicated he intended to introduce the post when the Appellant testified, and the State objected on several grounds, including that it was hearsay and that Appellant had not provided the evidence to the State in a timely manner. After hearing argument from counsel, the trial court disallowed the evidence, indicating that he did not believe the evidence could come in through Appellant's testimony.

---

[7] At the motion for new trial hearing, trial counsel expressed uncertainty about when he first learned about the post.

17

Appellant does not challenge the trial court's ruling and instead argues only that his trial counsel was ineffective because he did not attempt to introduce the post when the grandmother testified rather than during Appellant's testimony. However, as the trial court found in its order denying Appellant's motion for new trial, the transcript does not contain a proffer of the Facebook post, and Appellant did not call the grandmother to testify at the motion for new trial hearing concerning the content of the post or the timing of the post relative to the grandmother's testimony about her observations of Appellant's interactions with the victim. This is particularly important because, at the hearing on the motion for new trial, there was confusion concerning whether the post had been made by Jackson's sister, and the descriptions of the contents of the post at trial and at the motion for new trial hearing were markedly different. Further, in his brief on appeal, Appellant now argues the post was "praising [him] as a father to [the victim]," which is more specific than what was said at trial or the motion for new trial hearing. Equally important, as the trial court found, the timing of the post is unknown. In order to bolster his argument, Appellant now asserts the post was made between the date of the incident and the date of the grandmother's testimony at trial. However, at trial, it was stated that the post was made on June 22, 2016, which was two months *before* the victim suffered the brain injury and about a

18

week *before* the events the grandmother described in her testimony that he sought to impeach.[8] Thus, Appellant has failed to show that the Facebook post would have been admissible as a prior inconsistent statement, and he has failed to carry his burden to show that trial counsel performed deficiently. Accordingly, this enumeration is without merit.

3. Appellant asserts that the trial court erred by admitting irrelevant and prejudicial evidence, namely pictures of firearms found during the search of the home he shared with Jackson. The record shows that the police obtained a search warrant for the home, and, at trial, the State introduced over 100 photographs of the home and items found during the search, including pictures of two handguns and the ammunition that was removed from the guns. Appellant objected on the basis that the photographs placed his character in evidence, and the State countered that its intent was to present the full evidence of what was recovered from the home, that there was nothing illegal about owning handguns, that there was no evidence that Appellant had used the handguns in an improper or violent manner, and that the State did not plan to make any specific mention of the handguns other than when the pictures were

---

[8] The grandmother testified that one of the occasions she observed Appellant's negative behavior was when his daughter was born on July 29, 2016.

introduced and identified. The trial court overruled Appellant's objection, and the photographs of the handguns were introduced along with the other pictures showing numerous, likewise irrelevant, items observed during the search. A detective who was present during the search identified each of the pictures as they were shown to the jury and explained without being prompted why there were multiple pictures of the same handguns shown in different locations.[9]

After the jury viewed the photographs, the trial court reconsidered its ruling on the admissibility of the pictures of the handguns. After a colloquy with counsel, during which the State's attorney elaborated that he did not want to redact the gun photographs because he had previously been involved in cases where the jurors had questioned the omission of certain pictures, the trial court decided that the best remedy was to provide the jury with a curative instruction. The trial court then gave the following instruction: "I'm going to direct that you're not to consider the fact that there are weapons in the house as to this issue for which [Appellant] is charged. It is – those two weapons . . . – that were in the house are not material to the charges for

---

[9] The witness testified that the guns were moved so identifying information could be photographed and also when the guns were unloaded.

which Appellant is standing trial for. So you are not to consider that in your deliberation." During its final charge, the trial court gave a similar instruction.

We agree with Appellant, and the State concedes, that the photographs of the handguns were irrelevant and, accordingly, should not have been admitted. See OCGA § 24-4-402 ("Evidence which is not relevant shall not be admissible."); see also *Martinez-Arias v. State*, 313 Ga. 276, 285 (3) (869 SE2d 501) (2022) (explaining that there are no exceptions to the exclusion of irrelevant evidence under OCGA § 24-4-402). But that does not mean that reversal is required; Appellant cannot show harm here.

To begin with, the trial court twice plainly instructed the jury that the photographs were not relevant and that the jury was not to consider them in deciding Appellant's guilt. The jury is presumed to follow the trial court's instructions, *Smith v. State*, 307 Ga. 263, 276 (3) (b) (834 SE2d 1) (2019), and "a new trial will not be granted unless it clear that the trial court's curative instruction failed to eliminate the effect of the prejudicial [evidence]." *Turner v. State*, 299 Ga. 720, 723 (5) (791 SE2d 791) (2016).

Although Appellant argues that the trial court's instructions were insufficient to cure the "highly prejudicial effect" this evidence had on the jury because the court

21

did not explain why the guns had been moved, in doing so he omits or misstates key testimony, namely the testimony of the detective who detailed standard procedure when photographing weapons. Additionally, the State did not reference the guns at any time other than when they were introduced, and the State never intimated or sought to elicit testimony that Appellant illegally owned the guns or that any crimes were associated with the guns. See *Roberts v. State*, 317 Ga. App. 385, 388 (2) (a) (730 SE2d 753) (2012) ("[O]ur Supreme Court has held that gun ownership and the custom of carrying a gun do not by themselves suggest bad character."). In light of these circumstances, and based on the record in this case, it is highly unlikely that the erroneously admitted evidence contributed to the jury's verdict, and a new trial is not warranted. *Martinez-Arias*, 313 Ga. at 293 (4).

4. Lastly, Appellant argues that he is entitled to a new trial due to the cumulative prejudicial effect of the trial court's evidentiary error and trial counsel's ineffectiveness. "To establish cumulative error a defendant must show that (1) at least two errors were committed in the course of the trial; and (2) considered together along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." (Citation and punctuation omitted.) *State v. Lane*, 308 Ga. 10, 21 (4) (838 SE2d 808) (2020). As set out above,

22

we have found one harmless evidentiary error – Division 3 – and one instance of presumed deficient performance – Division 2 (c). Neither of these matters directly touched on Appellant's guilt for the crimes charged, and the presumed deficiency and trial court error were on unrelated matters. Considered cumulatively in light of the entire record, we have no hesitancy in concluding that these errors, even when taken together, do not warrant a new trial. See, e.g., *Stafford v. State*, 312 Ga. 811, 824-825 (6) (865 SE2d 116) (2021).

*Judgment affirmed. Rickman, C. J., and Miller, P. J., concur.*