311 Ga. 34
FINAL COPY

S20A1548.  McKELVEY v. THE STATE.

LaGrua, Justice.

Appellant Sacorey McKelvey was convicted of murder and other crimes in connection with the shooting death of Corey Owens.[1] On appeal, McKelvey contends that the evidence presented at trial was insufficient to support his convictions; that the trial court erred by admitting into evidence his 2009 convictions for terroristic threats; that the trial court erred in striking two potential jurors for cause; and that his trial counsel rendered constitutionally

---

[1] The crimes occurred on April 24, 2014.  In March 2015, a Muscogee County grand jury indicted McKelvey for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony.  After a trial in July 2017, the jury found McKelvey guilty of all counts. The trial court sentenced McKelvey to serve life in prison without the possibility of parole for malice murder and a five-year consecutive term for the firearm possession count.  The other counts merged or were vacated by operation of law. McKelvey filed a timely motion for new trial in September 2017, which he twice amended through new counsel.  After a hearing, the trial court denied McKelvey's motion on March 4, 2020.  McKelvey filed a timely notice of appeal, and his case was docketed to the August 2020 term of this Court and submitted for a decision on the briefs.

ineffective assistance by failing to call two alibi witnesses. For the reasons set forth below, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following: Owens had a biological brother, Gregory Owens, and a stepbrother, Matthew Mungin. Elexis Cooper is the mother of Gregory's children. In March 2009, McKelvey confronted Elexis and her cousin after an altercation between their families, pointing a gun in Elexis's face and threatening to kill her. Following this incident, McKelvey was arrested and incarcerated. On November 17, 2009, McKelvey pleaded guilty to three counts of terroristic threats and was sentenced to three concurrent probated terms of five years.

On April 22, 2014, McKelvey ran into Owens and told him he wanted to meet with Owens, Gregory, and Mungin. That evening, Owens, Gregory, and Mungin met McKelvey in a field adjacent to a group of apartment homes on Adair Avenue in Columbus. People who frequent this area often refer to it as "Adair." Soon after meeting the brothers, McKelvey got angry and started talking about

2

his past "trouble for a pistol charge" — referencing the 2009 incident with Elexis. McKelvey told the brothers that they "owed" him money or drugs for what happened in 2009, blaming Gregory, in particular, for McKelvey's arrest, incarceration, and inability to get a job. Gregory said they owed him nothing, and McKelvey pulled a gun and aimed it at Gregory's face. Gregory charged McKelvey, and the two fell to the ground fighting. Mungin and Owens joined in, trying to wrestle the gun away from McKelvey. Ultimately, Mungin was able to get the gun away from McKelvey. McKelvey told Mungin he was going to get another gun and come back. McKelvey then ran away, saying he was going to kill all of them. The brothers immediately left the area.

Elexis's mother, Debra, witnessed the incident in the field from her apartment. Debra, who has known McKelvey since he was a child, testified that she saw him tussling with Owens, Gregory, and Mungin and heard someone say "he got a gun," referring to McKelvey. Debra said the brothers "wrestled [McKelvey] down and

3

took the gun." Everyone then scattered and left, and Debra heard McKelvey tell the brothers that he "was going to kill them all."

Later the same night, Debra was standing on her back porch when she saw McKelvey approach with a gun. McKelvey was angry, and Debra tried to calm him down, encouraging him to "just leave it alone, . . . just let it go." McKelvey told her he "had to kill them"; she understood "them" to mean Owens, Gregory, and Mungin.[2] McKelvey then mentioned Debra's daughter, Elexis, and the fact that Gregory lived with her. Debra got upset, explaining that Elexis had nothing to do with what happened earlier that day. Debra called Elexis and made McKelvey speak with her. McKelvey told Elexis he would not go to her house "with the mess," but he was going to kill Owens, Gregory, and Mungin.[3] When Debra saw McKelvey again the next day, he confirmed he would not go to

_____

[2] Debra testified that earlier the same night, McKelvey kicked in the door of an apartment in Adair where the brothers hung out and sold drugs, but no one was in the apartment at the time.

[3] After Elexis spoke to McKelvey, she contacted the police to report his threats against the brothers. A day or two later, Elexis also contacted McKelvey's probation officer to report the threats.

4

Elexis's house. For the next couple of days, Owens, Mungin, and Gregory stayed away from Adair and their apartment because, according to Mungin and Gregory, they continued receiving threats that McKelvey was going kill them.

On April 24, Mungin spoke to Owens on the phone between 1:00 and 2:00 p.m. Owens indicated that he was going to Adair to pick up his children and would call Mungin when he returned to his house. At 1:28 p.m., McKelvey picked up his paycheck from the construction company where he worked. Debra McNeil, the owner of the company, gave McKelvey his paycheck and observed that he was dressed in all black. McKelvey was accompanied by Kazarita Piatt, his sister's boyfriend. From McNeil's position in the front office, she had a view of the parking area, and she noted McKelvey was traveling in a black car with tinted windows. McNeil's husband, David, was in his truck in the parking lot at the same time and also noticed that McKelvey was traveling in a compact, black car with tinted windows. After getting his paycheck, McKelvey and Piatt left in the black car.

5

The same afternoon, Martin DeJesus and Nigel Staples were walking in Adair near the intersection of Wynnton Road and Adair Avenue when they saw a black car pull up. A man with dark skin and shoulder-length dreadlocks jumped out of the car and hid behind some nearby poles. About ten minutes later, DeJesus saw a white SUV traveling toward the intersection where the man was hiding, and at that point, the man came out from behind the poles and "went to shooting." The man fired toward the SUV a couple times and then approached the car, continuing to shoot. Staples yelled out, and the man looked at them, ran to a church around the corner, and disappeared. DeJesus went up to the SUV and saw a man — later identified as Owens — seated in the driver's seat, bleeding from gunshot wounds and struggling to breathe. DeJesus was interviewed at the scene and then taken to police headquarters, where he identified McKelvey from a photographic line-up as the shooter. Prior to that day, DeJesus had never seen McKelvey or Owens.

Adair resident Gwendolyn Woodson also witnessed the shooting. She was walking down Adair Avenue toward Wynnton Road that afternoon when she saw Owens driving a white SUV. She then saw a man, whom she recognized as McKelvey, run alongside Owens's SUV, shooting at Owens. McKelvey ran across the street in front of Woodson toward a nearby church, and as he passed her, he turned around to shoot at the SUV again. Police later showed Woodson a photographic line-up and she identified McKelvey as the shooter. In the picture, McKelvey wore dreadlocks. Woodson was familiar with Owens and McKelvey, having known Owens for a long time and recognizing McKelvey "from the streets."

Another witness, Betty McMiller, was in a nearby apartment in Adair at the time of the shooting. McMiller testified that she heard multiple gunshots and then saw a man with dreadlocks, dressed in black, running away from the scene around the back of the church.

Dominic Cobb was also in the area at the time. Cobb, his wife, and some friends were driving through the Adair neighborhood

when they observed "a black male in all black" with dreadlocks standing in front of the Adair Apartments. Cobb saw the man pull out a handgun, heard gunshots, and turned to see a white SUV driven by Owens, a childhood friend, slam on its brakes as it was hit by gunfire. Cobb saw the shooter "empty his gun out" on Owens's vehicle. Cobb then saw the shooter run up to the intersection of Wynnton Road and Adair Avenue and jump into a black Pontiac "Trans Am." Cobb told his friend to follow the car and asked his wife to call 911. During the 911 call, which was placed at 1:50 p.m., Cobb's wife provided a partial license plate number for the vehicle, a description of the vehicle, and a description of the shooter. Later that afternoon, Cobb was interviewed by the police and confirmed that prior to April 24, he did not know and had never encountered McKelvey.

Police officers and emergency personnel responded to the scene of the shooting, where they found a white SUV in the middle of the roadway near the intersection of Adair Avenue and Wynnton Road. Owens was still seated in the driver's seat of the SUV and was non-

8

responsive. Emergency personnel transported Owens to the hospital, where he later died from a gunshot wound to the head. Investigators at the scene noted that there were multiple bullet holes through the driver's-side windows and doors. Officers searched the area, but did not recover a weapon.[4]

At trial, an officer with the Columbus Police Department testified that she checked the partial tag number provided by 911 dispatch and received a hit for Georgia license plate number PRW6200; associated with a 2003 black Pontiac Grand Am registered to Okevia McKelvey, McKelvey's sister.

Police were immediately dispatched to Okevia's address, where they located the Grand Am. The hood of the car and brake rotors were hot, as if the car had just been running. Okevia gave consent to a search of her apartment and said the Grand Am had not been moved since that morning. Officers did not find anyone matching the description of the shooter inside the residence. Inside the Grand

---

[4] Law enforcement never located the gun used to shoot Owens.

Am, officers found McKelvey's April 24 paycheck on the center console.

Billy Moss, who dated McKelvey's mother, Michelle, spoke to McKelvey on the afternoon of April 24 when McKelvey was picking up his paycheck. Moss testified that later the same afternoon, between 2:00 and 4:00 p.m., Michelle received a phone call, became very upset, and fainted. Moss later learned about the shooting in Adair and that McKelvey had left Columbus to avoid the police. Shortly thereafter, Moss saw McKelvey with Michelle in Phenix City, Alabama.

On April 25, warrants were taken out for McKelvey's arrest, and officers began searching for him. In early June, based upon information Moss provided, law enforcement located McKelvey at a Columbus residence. McKelvey fit the description the eyewitnesses had provided, including wearing his hair in long dreadlocks. When officers first apprehended McKelvey, he gave them a false name, but he soon admitted his true identity.

On the night of his arrest, McKelvey agreed to waive his *Miranda*[5] rights and give a statement to the police. During the interview, McKelvey admitted that a couple days before the murder, he was in a fight with Owens, Gregory, and Mungin and had his gun taken away from him. He told the police that he never liked the brothers because "they sent me to jail on some bulls***." He claimed that during the meeting, the brothers "surrounded" him, "jumped on" him, and "grabbed [his] strap." McKelvey stated that he returned on the same day of the altercation "ready to fight," but the brothers "were nowhere to be found." He acknowledged that he spoke to Debra that night and asked her to tell the brothers to bring his "strap" and "come on back." McKelvey was angry that his only gun was taken because it was "hard as s*** to come up on," and "it was a blessing" that he had it. McKelvey said he wanted his gun back, so he decided when the brothers came back to Adair he would "catch them one by one" and "whoop their motherf****** a**."

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

11

McKelvey stated that at the time of the murder on April 24, he was at his employer's office and then at Okevia's apartment, admitting that when the police arrived, he "ran out the back door" and "took off." Following the interview, McKelvey was charged with Owens's murder and taken into custody.

On June 7, 2014, while incarcerated at the Muscogee County Jail, McKelvey sent a written message to the deputies at the jail, stating, "i scary for life i kill his cuz and he in here i scary for life [sic]." When a deputy spoke with McKelvey about the message to better understand what it meant, McKelvey explained that there was a person in the cell with him that was a cousin of the person McKelvey killed, and he wanted to be relocated from that cell. The next day, deputies received another written message from McKelvey, stating, "I scary for my cause i kill his homie boy [sic]."

2. McKelvey contends that the evidence presented at trial was insufficient to support his convictions based upon the following: (a) there was not enough time for McKelvey to travel from his employer's office at 1:28 p.m. and arrive at the crime scene by 1:50

12

p.m. because of the distance between these locations; (b) there was no evidence to show how McKelvey knew or could have known Owens's whereabouts at the time of the murder; (c) the eyewitness identifications of McKelvey as the shooter were unreliable; (d) Owens could have been shot by another person in relation to Owens's drug-dealing activities; and (e) the evidence was inadequate to establish that McKelvey sent the written communications to deputies at the jail. We disagree and conclude that the evidence presented at trial was sufficient to support McKelvey's convictions.

When evaluating challenges to the sufficiency of the evidence to support criminal convictions as a matter of constitutional due process, "we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Boyd v. State*, 306 Ga. 204, 207 (1) (830 SE2d 160) (2019) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979) and *Jones v. State*, 304

13

Ga. 594, 598 (820 SE2d 696) (2018)). Here, the evidence presented at trial included the testimony of multiple eyewitnesses who positively identified McKelvey as the shooter. Other witnesses testified about McKelvey's motive for shooting Owens, which included blaming Owens and his brothers for his 2009 incarceration, as well as the physical altercation that occurred on April 22, resulting in the loss of McKelvey's gun. Witnesses also testified that after this altercation, McKelvey made multiple threats to kill Owens and his brothers. McKelvey admitted that he was angry and wanted to fight with Owens, Gregory, and Mungin after what happened on April 22, and McKelvey also admitted to the deputies at the jail that he killed someone.

Additionally, evidence was presented at trial to show that the drive from McKelvey's workplace to the crime scene could be completed in about 15 minutes — within the roughly 20-minute period between the time McKelvey left his employer's office and the time Owens was shot in Adair.[6] McKelvey's arguments to the

[6] One of the officers who testified for the State confirmed that the

14

contrary, like his other arguments concerning the reliability of the evidence and the possibility of another shooter, were matters within the province of the jury to consider and decide. See *Lowery v. State*, 310 Ga. 360, 362 (1) (a) (851 SE2d 538) (2020).

This evidence of McKelvey's guilt was not only sufficient for a reasonable jury to find him guilty beyond a reasonable doubt; it was overwhelming. See *Brown v. State*, 300 Ga. 446, 447-448 (1) (796 SE2d 283) (2017) (evidence, including testimony of multiple eyewitnesses who identified defendant as the shooter, not only sufficient to support convictions, but overwhelming). As such, this enumeration of error fails.

3. McKelvey contends that the trial court abused its discretion by admitting into evidence his 2009 convictions for terroristic threats because they were not admissible as intrinsic evidence or to prove prior difficulties with the Owens brothers or motive under OCGA § 24-4-404 (b) ("Rule 404 (b)"). We disagree and

distance between McKelvey's workplace and Adair is approximately nine miles — a fifteen-minute drive.

15

conclude that the trial court did not abuse its discretion in admitting the evidence on this basis.

> Evidence is admissible as intrinsic evidence, rather than extrinsic evidence subject to Rule 404 (b), when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense. Even when evidence is intrinsic, however, it must also satisfy Rule 403 [OCGA § 24-4-403]. It is within the trial court's sound discretion to determine whether to admit such evidence, so we review a trial court's ruling admitting evidence as intrinsic for an abuse of that discretion.
>
> Evidence pertaining to the chain of events explaining the context, motive, and set-up of the crime is properly admitted as intrinsic evidence if it is linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury. Moreover, intrinsic evidence remains admissible even if it incidentally places the defendant's character at issue.

*Harris v. State*, 310 Ga. 372, 377-378 (2) (b) (850 SE2d 77) (2020) (citation and punctuation omitted). See *Williams v. State*, 302 Ga. 474, 485-486 (IV) (d) (807 SE2d 350) (2017).

Evidence relating to McKelvey's 2009 convictions pertained to the chain of events explaining the "context, motive, and set-up of the

16

crime" and was reasonably necessary for the State to "complete the story of the crime" to the jury. This evidence helped to explain why the April 22 altercation between McKelvey and the Owens brothers occurred and how the altercation established a motive for McKelvey's shooting of Owens on April 24. See *Harris*, 310 Ga. at 3678 (2) (b); *McCammon v. State*, 306 Ga. 516, 522 (2) (832 SE2d 396) (2019) (concluding that the backstory explaining why one person would decide to rob another person was intrinsic to the charged crimes). Moreover, by McKelvey's own admission in his statement to police following his arrest, the April 22 altercation was, at least in part, motivated by the fact that he blamed the brothers for his 2009 convictions. The testimony of Gregory and Mungin also supported this notion.

McKelvey also argues that the 2009 incident was not intrinsic to the charged crimes because it was too remote in time and did not specifically involve the brothers; however, we have previously recognized:

It is true that whether evidence is linked in time and circumstances with the charged crime is pertinent to the intrinsic-evidence analysis, but there is no bright-line rule regarding how close in time evidence must be to the charged offenses, or requiring evidence to pertain directly to the victims of the charged offenses, for that evidence to be admitted properly as intrinsic evidence.

*Harris*, 310 Ga. at 381 (2) (b) (citations and punctuation omitted). We thus conclude that the 2009 convictions were sufficiently linked to Owens's shooting and that the trial court did not abuse its discretion in admitting this intrinsic evidence in this case. See *Clark v. State*, 306 Ga. 367, 373-374 (4) (829 SE2d 306) (2019) (three-year-old incident between defendant and victim's wife was intrinsic to charged crimes).

4. McKelvey contends that the trial court erred by granting the State's motion to strike Jurors 31 and 48 for cause over his objection. See OCGA § 15-12-164 (requiring court to excuse for cause any jurors determined to be "incompetent" or "substantially impaired in [their] ability to be fair and impartial"). We disagree.

"Whether to strike a juror for cause is a matter committed to the sound discretion of the trial court, and we will not find error in

18

an exercise of that discretion absent a showing that the discretion was manifestly abused." *Carter v. State*, 302 Ga. 685, 686 (2) (808 SE2d 704) (2017). Such discretion includes the "'broad discretion to determine a potential juror's impartiality and to strike for cause jurors who may not be fair and impartial.'" *Lanier v. State*, 310 Ga. 520, 529 (5) (852 SE2d 509) (2020) (quoting *DeVaughn v. State*, 296 Ga. 475, 477 (2) (769 SE2d 70) (2015)). "'A conclusion on an issue of juror bias is based on findings of demeanor and credibility which are peculiarly in the trial court's province, and those findings are to be given deference.'" Id. (quoting *Peterson v. State*, 282 Ga. 286, 288 (2) (647 SE2d 592) (2007)).

During voir dire, when the prosecutor asked if any of the panel members knew McKelvey, Juror 31 stated that he was friends with McKelvey in middle school. When asked whether he would "be able to set that relationship aside and decide this case based on the evidence that's presented," Juror 31 answered, "No."

Similarly, Juror 48 stated that she had gone to middle school with McKelvey. When asked if she would "be able to set that

19

relationship aside," Juror 48 said, "I don't want to do it." When the prosecutor asked Juror 48 a second time whether she thought she would be able to set the relationship aside, Juror 48 replied, "No sir. Oh, no, sir." Neither the prosecutor nor defense counsel asked any further questions in an attempt to rehabilitate the jurors.

Following voir dire, the State moved to strike both jurors for cause, and McKelvey objected. After hearing argument from both sides, the trial court noted that Juror 31 "could not decide the case fairly" and that Juror 48 "could not set aside [her] prior relationship" with McKelvey, and the court struck both jurors for cause.

The trial court did not abuse its discretion by striking Juror 31 based on his statement that he would not be able to set aside his relationship with McKelvey and decide the case based on the evidence presented. Likewise, the trial court did not abuse its discretion by striking Juror 48 based on her statement indicating that she would not be able to set aside her relationship with McKelvey. See *Lanier*, 310 Ga. at 529 (5) (no abuse of discretion where trial court struck for cause juror who expressed bias toward

20

defendant based on their relationship); *Hillman v. State*, 296 Ga. App. 310, 313 (2) (674 SE2d 370) (2009) (no abuse of discretion where trial court struck jurors for cause based on their personal relationship with defendant). Thus, this enumeration also fails.[7]

5. McKelvey contends that his trial counsel rendered constitutionally ineffective assistance by failing to call two alibi witnesses: his sister, Okevia, and her boyfriend, Piatt. According to McKelvey, these witnesses could have provided information about his whereabouts at the time of the shooting, and he asked his trial counsel to call both as witnesses.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was

---

[7] Within this enumeration of error, McKelvey also contends that while his trial counsel objected to Jurors 31 and 48 being struck for cause, to the extent she did not seek to voir dire these jurors further, she rendered constitutionally ineffective assistance. Even were we to assume that counsel performed deficiently by not questioning these jurors further, McKelvey presented no evidence demonstrating that either juror could have been rehabilitated. Thus, McKelvey failed to meet his burden of demonstrating that counsel's alleged deficiency prejudiced McKelvey under the standard of *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984). See *Anderson v. State*, 309 Ga. 618, 628-629 (5) (b) (847 SE2d 572) (2020).

deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); see also *Wesley v. State*, 286 Ga. 355, 356 (3) (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "In reviewing the trial court's decision, we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." *Andrews v. State*, 293 Ga. 701, 703 (2) (749 SE2d 734) (2013) (citation and punctuation

22

omitted). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (2) (690 SE2d 801) (2010).

At the motion for new trial hearing, McKelvey's trial counsel testified that she could not remember exactly why she elected not to call Okevia and Piatt as witnesses, but she did "recall there was a significant reason why." Trial counsel also testified that it was in McKelvey's best interest not to call Piatt, as his testimony could have been detrimental. She further stated that she was aware of Okevia and Piatt prior to trial, but neither had any information or knowledge about what happened on the day of the murder to assist in McKelvey's case. While McKelvey testified that he believed Okevia and Piatt would have given "helpful" testimony, he provided no further information or details about what information they would have provided. Moreover, neither Okevia nor Piatt testified at McKelvey's motion for new trial hearing.[8] In the trial court's order

_____

[8] In his appellate brief, McKelvey contends that he presented an affidavit

23

denying McKelvey's motion for new trial, the trial court found that he failed to show that "either person could have provided a believable alibi."

"A decision as to which defense witnesses to call is a matter of counsel's trial strategy and tactics and will not support a claim of ineffective assistance of counsel unless it is so unreasonable that no competent attorney would have made the decision under the circumstances." *Smith v. State*, 308 Ga. 81, 92 (4) (839 SE2d 630) (2020) (citation and punctuation omitted). We conclude that trial counsel's decision to forgo seeking Okevia's or Piatt's testimony was a strategic decision because their testimony would not have been helpful — and may even have been harmful — to McKelvey's defense, and because the trial court found no value to their testimony as alibi witnesses based on a lack of evidence of what they

from Okevia at his motion for new trial hearing, in which she averred that she "would have come to court if subpoenaed for trial, she would have testified that her brother was with [Piatt] and that they had just come from picking up their paychecks." That affidavit, however, is not included in the record on appeal, and thus, we cannot consider it. See *Ware v. State*, 279 Ga. 17, 18 (2) (608 SE2d 643) (2005) (appellant has burden to show counsel's ineffectiveness and to "compile a complete record of what transpired in the trial court").

24

would have said.  Therefore, McKelvey has failed to overcome the "strong presumption" that his trial counsel's decision to not call Okevia or Piatt to testify at trial fell "within the broad range of professional conduct." *Reid v. State*, 286 Ga. 484, 486 (3) (a) (690 SE2d 177) (2010) (trial counsel's decision not to call potential alibi witness because counsel thought witness's testimony "would be detrimental to the defense" was not deficient);  see also *Andrews*, 293 Ga. at 703 (2) (trial counsel's decision not to call defendant's girlfriend as potential alibi witness because counsel "believed that doing so would not have been helpful to [defendant's] case" was not deficient).

McKelvey has also failed to demonstrate any prejudice as he has not shown that either witness would have given him "a solid and complete alibi for the time of the murder." *Moss v. State*, 298 Ga. 613, 619 (5) (d) (783 SE2d 652) (2016).  As such, this enumeration of error also fails.

*Judgment affirmed.  All the Justices concur.*

Decided March 1, 2021.

Murder. Muscogee Superior Court. Before Judge McBride.

*Angela Dillon*, for appellant.

*Julia F. Slater, District Attorney, Frederick Lewis, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth Rosenwasser, Assistant Attorney General*, for appellee.