313 Ga. 1
FINAL COPY

S21A1079.  HINES v. THE STATE.

WARREN, Justice.

Lee Hines was tried by a Fulton County jury and convicted of malice murder and felony murder in connection with the stabbing death of Lacharity Gaines.  Hines's sole contention on appeal is that the trial court erred when it allowed the State to present a "surprise witness" who was not disclosed to the defense until the day of trial. Seeing no error, we affirm.[1]

1.  The evidence presented at trial showed the following.  Hines lived in New York and met Gaines while on a visit to Atlanta.  The

---

[1] Gaines was killed on or about February 26, 2003.  On October 5, 2010, a Fulton County grand jury indicted Hines, charging him with malice murder and felony murder predicated on aggravated assault.  Hines was tried in November 2014, and a jury found him guilty of both counts.  The trial court sentenced Hines to life in prison for malice murder, and the felony murder count was vacated by operation of law. Hines timely filed a motion for a new trial on November 17, 2014.  He amended the motion through new counsel on May 20, 2019, and again amended it through new counsel on August 20, 2020. After a hearing, the trial court denied the motion on April 5, 2021.  Hines filed a timely notice of appeal, and this case was docketed in this Court to the August 2021 term and submitted for a decision on the briefs.

two developed a relationship, and after a few weeks, Hines left New York and moved into Gaines's apartment in Atlanta, where she lived with her two minor children. Testimony showed that the couple's relationship deteriorated shortly after Hines moved in. Among other things, Gaines confided to a friend that she wanted Hines to "move out instantly" because they "weren't getting along," that Hines was "rude" to her and her children, that he "threatened" her, and that she was "afraid" and "scared" of him.

On February 26, 2003, after Gaines and her children returned home from a shopping trip, she and Hines started arguing loudly, and one of the children saw that Hines "pushed" or "shoved" Gaines. Around 8:00 that evening, Gaines called her friend and told her, in a "whispering" voice, that Hines was in the apartment "still doing the same thing, being rude," and that Gaines was "scared." That same night, Sarah Raven, who lived directly below Gaines's apartment, heard noises coming from above "like someone was wrestling or having some kind of tussle," and she also "heard [Gaines] scream," after which "everything was silent." Raven

testified that, just an hour or two earlier, she had gone into Gaines's apartment and had seen Hines there.

The next morning, Gaines's children woke up to find both Hines and Gaines missing. Hines's personal belongings were not in the apartment, and Gaines's newly purchased Toyota was gone. The police were contacted, but Gaines was not found until days later, when her uncle entered the apartment and discovered her decomposing body in the pantry, wrapped in a rug. An autopsy revealed that Gaines died from a stab wound to the back that punctured her lung.

A police investigation revealed no signs of forced entry into Gaines's apartment. Her car was discovered in Charlotte, North Carolina, where it had been impounded after being parked illegally near a Greyhound bus station. One of the items found in her car — a CD — contained Hines's fingerprint. Nail clippings collected from Gaines contained DNA that was consistent with Hines's. At trial, multiple witnesses identified Hines in court as the man who had lived with Gaines before her murder.

On the first day of trial, before the presentation of any evidence, the parties learned about a new witness who had incriminating information about Hines. More specifically, the prosecutor informed the trial court that, earlier that morning, he learned that one of the State's witnesses, Sarah Raven, had brought her niece, Ashley Johnson, to the courthouse. According to the prosecutor, Johnson had overheard a discussion about the case and told him that she "was there the night [Gaines] went missing," and she "relayed what she's going to testify to, if she's allowed to testify." The prosecutor told the court that he previously was aware that Raven's niece "had been in [Gaines's] apartment a couple of times," but that he did not know the niece's name or contact information and "didn't think she knew anything about the case that was relevant."

The prosecutor further told the court that defense counsel had been informed about Johnson and had the chance to talk to her:

> In the middle of [Johnson] talking to me I stopped her, because I know [defense counsel] — I had just spoken to him, and he was at the end of the hallway. I said, I'm

4

going to stop you right now, come with me. She walked with me, and I introduced her to [defense counsel]. I said tell him what you were telling me; if he has any questions, please answer them.

The prosecutor informed the court that Johnson had been outside the courtroom for two hours, "subject to any further interviews that needed to be taken."

Defense counsel did not contest the prosecutor's version of events, but objected to Johnson testifying, arguing that the State failed to disclose her as a witness at least ten days before trial. The trial court overruled the objection, finding that Johnson was "newly discovered" by the State and had been made available to the defense. The trial court also found that defense counsel "has spoken to [Johnson] and has opted not to speak to her for the last hour-and-a-half, at least, so I don't know how a continuance at this time for another couple days would make any difference."

At trial, Johnson testified that she spent two days in Gaines's apartment braiding Gaines's and Hines's hair, working on Gaines's hair one day and on Hines's hair the next. Johnson said that her

work was interrupted because Hines and Gaines "were arguing back-and-forth repeatedly." Johnson further recalled Hines saying: "I don't even like black girls, that's why my baby mama Puerto Rican, yo, shut up talking to me, yo, you don't know what I do to you, I'll hurt you, yo, I'll kill you, yo." And, according to Johnson, Hines was using "the B word" to refer to Gaines.[2]

2. On appeal, Hines essentially contends that the State violated OCGA § 17-16-8 (a) by failing to disclose Johnson as a witness at least ten days before trial,[3] and that the trial court abused its discretion when it failed to exclude her testimony pursuant to the

---

[2] It is not clear from Johnson's testimony on which days — or how long before the murder — she was in Gaines's apartment and overheard Hines threaten to kill Gaines.

[3] OCGA § 17-16-8 (a) provides:
> The prosecuting attorney, not later than ten days before trial, . . . shall furnish to the opposing counsel . . . the names, current locations, dates of birth, and telephone numbers of that party's witnesses, unless for good cause the judge allows an exception to this requirement, in which event the counsel shall be afforded an opportunity to interview such witnesses prior to the witnesses being called to testify.

remedial provisions contained in OCGA § 17-16-6.[4]  In this regard, Hines asserts that Johnson was a "surprise witness" and that he received insufficient time to investigate her and prepare for her testimony.  We disagree.

To begin, we discern no violation of OCGA § 17-16-8 (a) with respect to Johnson.  We have stated that the "witness list rule" set forth in that statute is "designed to prevent a defendant from being surprised at trial by a witness that the defendant has not had an opportunity to interview." *Rose v. State*, 275 Ga. 214, 217 (563 SE2d 865) (2002) (citation and punctuation omitted).  Moreover, the trial court "may allow an exception to the rule where good cause is shown and counsel is afforded an opportunity to interview the witness."  Id. See also *Gabriel v. State*, 280 Ga. 237, 239 (626 SE2d 491) (2006).

---

[4] OCGA § 17-16-6 provides in relevant part:

> If at any time during the course of the proceedings it is brought to the attention of the court that the state has failed to comply with the requirements of this article, the court may order the state to permit the discovery or inspection, interview of the witness, grant a continuance, or, upon a showing of prejudice and bad faith, prohibit the state from introducing the evidence not disclosed or presenting the witness not disclosed, or may enter such other order as it deems just under the circumstances. . . .

Here, the trial court determined that the State established good cause for not disclosing Johnson at least ten days before trial. The prosecutor told the court that the State previously was not aware of Johnson's name or contact information and did not know that she had relevant information about Gaines's murder; the State only learned that Johnson was a potential witness when she came forward on the day of trial. Defense counsel did not dispute the prosecutor's explanation, which the trial court accepted, finding that Johnson was "newly discovered." Moreover, the transcript shows that the trial court complied with OCGA § 17-16-8 (a) by affording Hines "an opportunity to interview" Johnson before she was called to testify. Under these circumstances, the trial court did not abuse its discretion in allowing an exception to the ten-day requirement under OCGA § 17-16-8 (a). See, e.g., *DeVaughn v. State*, 296 Ga. 475, 478 (769 SE2d 70) (2015) (trial court "did not abuse its discretion in ruling that the State had established good cause for allowing an exception to the ten-day rule" where, after substantial efforts to find the witness, the State "was able to identify and speak

8

with [him] for the first time as the jury was being selected").

Because the requirements of OCGA § 17-16-8 (a) were satisfied with respect to Johnson, we need not decide whether the trial court also abused its discretion when it declined to exclude Johnson's testimony under OCGA § 17-16-6, which provides certain remedies when the State "has failed to comply with the requirements of this article[.]" See *Cockrell v. State*, 281 Ga. 536, 539 (640 SE2d 262) (2007) ("OCGA § 17-16-6 sets forth the remedies available to a defendant upon the State's failure to comply with discovery.").[5] For the foregoing reasons, we affirm.

*Judgment affirmed. All the Justices concur.*

---

[5] To the extent Hines contends that the trial court abused its discretion in not granting him a continuance — and assuming he requested such a continuance below — this claim also fails. "All applications for continuances are addressed to the sound legal discretion of the court and . . . shall be granted or refused as the ends of justice may require." OCGA § 17-8-22. "Without a clear showing of abuse of this broad discretion, this Court will not disturb a trial court's decision to deny a motion for continuance." *Phoenix v. State*, 304 Ga. 785, 788 (822 SE2d 195) (2018). In light of Hines's failure to use all of the time he received to interview Johnson — among other facts in the record — we cannot say that the trial court abused its discretion in declining to grant Hines a continuance. See *Terrell v. State*, 304 Ga. 183, 187 (815 SE2d 66) (2018); *Norris v. State*, 289 Ga. 154, 157 (709 SE2d 792) (2011).

Decided December 14, 2021.

Murder. Fulton Superior Court. Before Judge Newkirk.

*John R. Monroe*, for appellant.

*Fani T. Willis, District Attorney, Lyndsey H. Rudder, Juliana Y. Sleeper, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.